COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-05-144-CR

 

 

PHILON OLIVER                                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

A jury convicted Appellant
Philon Oliver of kidnaping and sexually assaulting T.J., a disabled adult
woman.  The jury assessed punishment at a
total of sixty years=
confinement, and the trial court rendered judgment accordingly.  In two points, Appellant argues that the
evidence was factually insufficient to support the verdict.  We affirm.








                                            Background

Appellant was employed as a
driver by a contractor for the Fort Worth Transportation Authority=s Mobility Impaired Transportation Service (AMITS@).  MITS provides transportation services to
disabled passengers.  Appellant drove a
car, as opposed to a bus or a van, in the course of his duties as a MITS
driver. 

Helen White, the director of
Heritage Adult Day Care, testified that the complainant, T.J., had attended her
facility for about two years.  White
testified that T.J. had suffered several strokes that left her physically
impaired, unable to speak in phrases longer than one or two words, and unable
to defend herself. MITS provided door-to-door transportation for Heritage
clients, including T.J., and Appellant was one of T.J.=s drivers. 








John Green, the director of
human resources, risk management, and security for the Fort Worth
Transportation Authority, testified that MITS received a complaint from T.J.=s mother stating that Appellant had taken T.J. to his apartment and
had sex with her.  Green testified that
he interviewed Appellant and identified T.J. as the complainant but did not
tell Appellant the nature of the complaint. 
Green said that Appellant asked, AAre you here to arrest me?@  Appellant told Green that he
had never taken T.J. to his apartment but then said he had taken her there one
time.  Appellant also said that he
regularly picked T.J. up early, drove her to his apartment, and left her in the
car while he made coffee in the apartmentCall in violation of MITS rules. 
Appellant told Green that T.J. had entered his apartment to use the
toilet on one occasion and was in the apartment for about three minutes.  Green testified that all MITS vehicles are
equipped with a GPS tracking system that monitors the vehicle=s location, speed, and route. 

Janice Pearce, an MITS
supervisor, testified that she was responsible for monitoring MITS vehicles
through the GPS tracking system.  Through
Pearce, the State offered a printout of the GPS log from Appellant=s vehicle for the day of the alleged assault.  According to the log, Appellant picked up
T.J. at her residence at 8:14 a.m., forty-six minutes earlier than
scheduled.  The log shows that Appellant
then drove directly past Heritage Day Care to a location near his apartment,
arriving there at 8:42.  His car remained
parked at that location until sometime between 8:54 and 9:39, when the GPS
system recorded his vehicle at another location.  Pearce testified that MITS records show that
Appellant phoned his employer and reported that he had picked up T.J. at her
residence at 9:36. 








Vivian Williams testified
that she lived with Appellant at the time of the alleged assault.  Williams said that she relies on MITS to
travel to and from work because she has extremely poor eyesight.  She met Appellant when he was her MITS
driver.  When Appellant returned home
from his interview with John Green, he told Williams that an MITS rider had
made a sexual-contact complaint against him. 
Appellant told Williams that he picked up T.J. and then returned to the
apartment to make a cup of coffee and let T.J. use the restroom.  Appellant told Williams that T.J. touched his
Aprivate parts@ as they
were leaving the apartment.  Williams
testified that seven days before the alleged assault, she noticed that the
pillows and other items on the bed in her guest bedroom had been moved.  She asked Appellant about it, and he said
that he had cleaned up the room for her, which struck Williams as odd because
Appellant had never cleaned up for her before. 
On the day of the alleged assault, Williams again noticed that one of the
pillows was askew on the bed.  A few days
later, Appellant laundered the bedclothes from the guest bedroom, which struck
Williams as odd because it was only time she ever saw him wash laundry.  Williams also said that on the day of the
alleged assault she called Appellant on his cell phone between 9:00 and 9:15
a.m.; Appellant told her AI=m glad you called because I overslept.@ 








Dr. Jeffery Chase, an
emergency room physician, testified that he examined T.J. in the emergency room
eight days after the alleged assault for a health problem unrelated to the
assault.  T.J.=s mother told him that T.J. had been sexually abused.  As part of his treatment, Dr. Chase conducted
a pelvic exam on T.J.  He saw no
indication that T.J. had been sexually abused such as bruises, tears, or
lacerations, but he testified that it would be very extraordinary to see such
indications on a sexual-abuse victim. 

The State then called T.J. to
testify.  T.J.=s testimony consists almost entirely of one-word answers, mostly Ayeah@ and Ano,@ to
questions posed by the State=s and Appellant=s counsel
and is at times confused and contradictory. 
She successfully named the colors of pens shown to her by the State=s counsel and identified various parts of anatomically-correct male
and female dolls.  She also identified
Appellant.  T.J. testified that Appellant
took her to his apartment three times. 
She said she did not want to go there and that Appellant did not ask her
if she wanted to go there.  She
identified photographs of Appellant=s apartment as the place where he took her.  T.J. testified that Appellant took her
clothes off and touched her vagina with his penis and that his penis went
inside her vagina.  She said that the
assault occurred on a bed and identified the bed in a photograph of the guest
room in Appellant=s
apartment.  She also identified the
bedspread that was on the bed at the timeCthe same bedspread Williams said Appellant later washed. 








Appellant testified in his
own defense.  He said that he often
picked up T.J. early because Asometimes we have so many people booked up.@  He testified that the GPS
tracking device was often inaccurate. 
Appellant said that after he picked up T.J. on the morning of the
alleged assault, he drove past the day care center because T.J. said she wanted
to ride with him to pick up the next passenger, whom Appellant was supposed to
pick up at 10:00.  Appellant testified
that he stopped at his apartment to get coffee even thought he knew it was
against MITS policy to do so.  He said
that he left T.J. in his car while he went into his apartment.  Appellant testified that he went back out to
the car to check on T.J. after five minutes and she told him that she needed to
use the bathroom.  Appellant said that he
let her use his bathroom, even thought that was against MITS policy, so that
she would not have an accident in his car. 
According to Appellant, he took T.J. into his apartment and into the
bathroom and shut the bathroom door.  He
said that while she was in the bathroom, he went to the kitchen to get
something to eat.  Appellant testified
that when he checked on T.J. a few minutes later,  he found her sitting on the bed of the guest
bedroom.  He said that T.J. asked him to
tie the drawstring on her pants. 
Appellant said that he pulled her pants up, tied the drawstring, and
helped T.J. out to his car.








Appellant testified that he
first learned about the sexual-assault allegation when his employer=s dispatcher told him to come to the office because T.J. had
complained that Appellant had taken her to his apartment to have sex.  He said that John Green, contrary to Green=s testimony, also told him that the complaint was sexual in
nature.  He testified that he washed the
guest-room bedspread because he got shoe polish on it; he also said that he did
laundry all the time and did not know why Williams said that he did not.  He denied that he ever had any type of sexual
contact with T.J.  He testified that T.J.
was Avery attracted@ to him, as
were many of his MITS passengers. 

On cross-examination,
Appellant said that various parts of John Green=s, Janice Pearce=s, Vivian
Williams=s, and T.J.=s testimony
were lies.  He testified that T.J. could
speak in complete sentences and that Helen White lied when she said that T.J.
could only speak in one- or two-word phrases. 
He explained that White lied because she had been romantically attracted
to him in the past. 

                                       Standard
of Review








In reviewing the factual
sufficiency of the evidence to support a conviction, we are to view all the
evidence in a neutral light, favoring neither party.  See Zuniga v. State, 144 S.W.3d 477,
481 (Tex. Crim. App. 2004).  The only
question to be answered in a factual sufficiency review is whether, considering
the evidence in a neutral light, the fact finder was rationally justified in
finding guilt beyond a reasonable doubt. 
Id. at 484.  In performing
a factual sufficiency review, we are to give deference to the fact finder=s determinations, including determinations involving the credibility
and demeanor of witnesses.  Id. at
481; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact finder=s.  Zuniga, 144 S.W.3d at 482.

                                             Discussion

Appellant argues that the
evidence is factually insufficient to support the jury=s verdicts because T.J.=s Avarious
physical ailments and disabilities have left her so mentally impoverished that
her testimony is unreliable as a matter of law[.]@  To support his argument,
Appellant points to those portions of T.J.=s testimony where T.J. seemed particularly confused or contradicted
herself.  For instance, when asked by the
prosecutor how often she rode with Appellant to pick up another passenger, T.J.
answered, ADay care.@  When asked whether she knew
what the word Asex@ means, she shook her head Ano.@

Appellant did not challenge
T.J.=s mental capacity to testify at trial, and the trial court permitted
her to testify after the State briefly questioned T.J. outside the presence of
the jury.  See Tex. R. Evid. 601(a)(1)
(providing that a witness is not competent to testify if the trial court
determines that the witness is insane).  A[T]he concept of truthfulness properly includes mental capacity as
well as moral disposition.@  Schutz v. State, 957
S.W.2d 52, 68 (Tex. Crim. App. 1997).  To
the extent that T.J.=s mental
capacity could be a factor in assessing her truthfulness and credibility, we
defer to the jury.  See Zuniga,
144 S.W.3d at 481.








Considering all of the
evidence in a neutral light, and deferring to the jury on the questions of T.J.=s credibility and demeanor, we hold that the jury was rationally
justified in finding guilt beyond a reasonable doubt.  We therefore overrule Appellant=s two issues and affirm the trial court=s judgment.

 

 

 

ANNE GARDNER

JUSTICE

 

PANEL F:    CAYCE, C.J.; GARDNER and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  May 25, 2006











[1]See Tex. R. App. P. 47.4.